UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

| | | |
|---|---|---|
| GREAT LAKES INSURANCE, S.E., | § | |
| | § | |
| *Plaintiff* | § | |
| | § | |
| vs. | § | Civil Action No. 3:20-05954-RV-HTC |
| | § | |
| PRESTIGE WORLDWIDE | § | |
| PENSACOLA CHARTERS LLC | § | |
| d/b/a LEGAL LIMTS OUTDOORS, | § | |
| | § | |
| *Defendant* | § | |

## GREAT LAKES INSURANCE, S.E.'S RESPONSE AND MEMORANDUM OF AUTHORITIES TO MOTION FOR SUMMARY JUDGMENT OF PRESTIGE WORLDWIDE PENSACOLA CHARTERS, LLC D/B/A LEGAL LIMITS OUTDOORS

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ...................................................................................1

**RESPONSE AND MEMORANDUM OF AUTHORITIES** ............................2

    BACKGROUND AND SUMMARY OF ARGUMENTS ...........................3

    OBJECTIONS & REBUTTAL TO STATEMENT OF FACTS .................8

    APPLICABLE LAW ...................................................................................11

        A.    New York Law Applies ....................................................11

        B.    This Hurricane Questionnaire Plan Is Not Ambiguous ..................15

        C.    Even Under Florida Law Breach Vitiates Coverage........................16

        D.    The Hurricane Questionnaire Plan Was Breached ..........................19

    CONCLUSION..............................................................................................21

**CERTIFICATE OF COMPLIANCE** ...................................................................22

**CERTIFICATE OF SERVICE** ...........................................................................22

**EXHIBIT A**

    Expert Report of Revel Boulon

# TABLE OF AUTHORITIES

## Cases

*Adrani Enterprises, Inc. v. Underwriters at Lloyds*, 962 F.Supp. 415, 419-20 (S.D.N.Y. 1997)  14

*Aetna Ins. Co. v. Dudney*, 595 So. 2d 238, 239 (Fla. App. 4 Dist. 1992) ............................... 13, 18

*AIG Centennial Ins. Co. v. O'Neill*, 782 F. 3d 1296, 1304 (11ᵗʰ Cir. 2015) ................................. 18

*Albany Ins. Co. v. Kieu*, 927 F.2d 882, 890 (5ᵗʰ Cir. 1991) ......................................................... 13

*Arguelles v. Citizens Prop. Ins. Corp.*, 278 So. 3d 108, 111 (Fla. Dist. Ct. App. 2019) .............. 15

*AXA Global Risks (UK), Ltd. v. Webb*, 2000 WL 33179617 (M.D. Fla., July 28, 2000) ....... 16, 20

*Commercial Union Ins. v. Flagship Marine Services*, 190 F.3d 26 31-32 (2d Cir. 1999) ..... 13, 17

*Fireman's Fund Ins. Co. v. Tropical Shipping & Construction Co.*, 254 F.3d 987, 1003 (11ᵗʰ Cir. 2001)................................................................................................................. 15, 20

*Firemans's Fund Ins. Co. v. Cox*, 742 F. Supp. 609 (M.D. Fla. 1989) ........................................ 17

*Geico Marine Ins. Co. v. Shackleford*, 945 F.3d 1135, 1140 (11ᵗʰ Cir. 2019).................... 15, 18

*Great Lakes Reinsurance (UK) PLC v. Dion,* 2009 WL 5174372, *2 (S.D. Cal. 2009) ............. 13

*Great Lakes Reinsurance (UK) PLC v. Durham Auctions, Inc.*, 585 F.3d 236, 242 (5th Cir. 2009) ............................................................................................................................. 12, 13

*Great Lakes Reinsurance (UK) PLC v. Rosin*, 757 F. Supp. 2d 1244, 1250-51 (S.D. Fla. 2010) 11

*Great Lakes Reinsurance (UK) PLC v. Rosin*, 757 F. Supp. 2d 1244, 1251 (S.D. Fla. 2010) .... 11, 12, 17

*Great Lakes Reinsurance (UK) PLC v. S. Marine Concepts, Inc.,* 2008 WL 6523861, at *2 (S.D. Tex. 2008) ......................................................................................................................... 13

*Great Lakes Reinsurance (UK) PLC v. Sea Cat I, LLC,* 653 F. Supp. 2d 1193, 1199 (W.D. Okl. 2009)......................................................................................................................... 12

*HIH Marine Services, Inc. v. Fraser*, 211 F.3d 1359, 1362 (11ᵗʰ Cir. 2000) ............................. 18

*Kephart v. Certain Underwriters at Lloyds of London*, 427 F.Supp.3d 508 (S.D.N.Y. 2019),.... 14

*Levine v. Aetna Ins. Co.*, 139 F.2d 217, 218 (2d Cir. 1943) ........................................................ 14

*Lexington v. Cooke's Seafood*, 835 F.2d 1364 (11ᵗʰ Cir. 1988)................................................... 17

N.Y. Ins. L.S 3106 .......................................................................................................................... 14

*Oretsky v. Infinity Ins. Co.*, 524 Fed. App'x 517, 523 (11ᵗʰ Cir. 2013) ...................................... 15

*SteelMet, Inc. v. Caribe Towing Corp.*, 747 F.2d 689, 695 (11ᵗʰ Cir. 1984) .............................. 18

*Swire Pac. Holdings, Inc. v. Zurich Ins. Co*. 45 So.2d 161, 165-66 (Fla. 2003) ........................ 15

*Taurus Holdings, Inc. v. U.S. Fid. v. Guar. Co.*, 913 So. 2d 528, 532 (Fla. 2005) ..................... 18

## Statutes

Fla. Stat. § 627.409(2).......................................................................................................... 16, 18, 20

## Treatises

Restatement (Second) of Conflict of Laws § 187-188.................................................................... 13

## RESPONSE AND MEMORANDUM OF AUTHORITIES

Plaintiff, GREAT LAKES INSURANCE, S.E. ("Great Lakes"), files this Response and Memorandum of Authorities in opposition to the Motion for Summary Judgment of Defendant, Prestige Worldwide Pensacola Charters LLC d/b/a Legal Limits Outdoors ("Prestige").   This Court should deny Prestige's Motion for Summary Judgment and grant Great Lakes' motion because Prestige's own Memorandum of Authorities acknowledges a tropical storm warning was issued for Pensacola and surrounding areas by 8:00 a.m. on Sunday, September 13th;[1] Captain Powers testified he saw a forecast for tropical storm force winds in the Pensacola area as early as Saturday, September 12th;[2] and yet, he did not act upon the Hurricane Questionnaire Plan before September 14th. His stated reason for not moving the vessel on September 14th was safety, but he admitted it could have been moved safely on September 13th.[3]  Since Pensacola was clearly under a tropical storm warning no later than September 13th, there is no disputed issue of material fact concerning Prestige's failure to comply with the Hurricane Questionnaire Plan.

The Hurricane Questionnaire Plan requires action whenever there is a tropical storm or a hurricane.  Prestige acknowledges Pensacola was under a tropical storm

---

[1] R. Doc. 33-1, p. 6, notes 10-11.
[2] R. Doc. 32-2, p. 7 of the exhibit, pp. 18-19 of the deposition.
[3] R. Doc. 32-2, p. 8 of the exhibit, p. 25 of the deposition.

warning as early as 8:00 a.m., on Sunday, September 13th.  It further acknowledges the vessel could have been moved safely on Sunday, September 13th.  One option for complying under the Hurricane Questionnaire Plan was to navigate the vessel approximately five miles to Pensacola Shipyard or Bahia Mar Marina, have it hauled out and stored ashore.  The second option was to drive the vessel a safe distance away and store it at a marina and/or to take it to Bon Secour and anchor it in a safe location with multiple anchors and tied to pilings.  Clearly, this second option was safely available to Prestige on September 13th, but it decided not to comply with its own Hurricane Questionnaire Plan.

The balance of Prestige's Motion cites to irrelevant and immaterial facts.  The "cone of uncertainty" in various weather charts is immaterial because the same charts plainly demonstrate Pensacola was under a tropical storm warning as early as 8:00 a.m. on Sunday, September 13th.  The tropical storm warning is sufficient to trigger action under the Hurricane Questionnaire Plan.  Prestige breached the Hurricane Questionnaire Plan, which voids coverage under the Policy, all as outlined in detail below.

## I.
## BACKGROUND AND SUMMARY OF ARGUMENT

Great Lakes issued a Premier and Pleasure Yacht Insuring Agreement covering the M/V LEGAL LIMITS between August 7, 2020, and August 7, 2021, which included Hull coverage (the "Policy"). The Policy was a renewal of the

3

previous policy year from August 6, 2019, to August 6, 2020. The Hull limits were $325,000 with a Named Windstorm deductible of $16,250.  The Policy incorporated the Application as part of the Insuring Agreement.  Part of the Application included the Hurricane Questionnaire Plan prepared by Prestige.  The Policy further provided that any breach of a warranty would void the Policy from inception.  Since Prestige clearly failed to comply with the Hurricane Questionnaire Plan, it breached a warranty in the Policy, which voids coverage.[4]

Great Lakes made the decision to bind and accept coverage based upon Prestige's representations that it would comply with the Hurricane Questionnaire Plan. The Hurricane Questionnaire provides that "in the event of a storm warning," the vessel will be "ashore."   Prestige prepared a written Plan attached to the questionnaire, which provided that "in the event of a tropical storm or hurricane," Prestige would arrange for a "haul-out" of the M/V LEGAL LIMITS by Pensacola Shipyard or Bahia Mar Marina so the vessel could be stored ashore. Alternatively, if the vessel was unable to be stored ashore, it would be driven a safe distance away and stored at a marina or taken to Bon Secour and anchored in a safe location. The Hurricane Questionnaire Plan was a warranty contained in the Policy, as well as an integral part of Great Lakes' decision to underwrite the risk.  Prestige's failure to

---

[4] R. Doc. 31-1, Great Lakes' Memorandum of Authorities in Support of its Motion for Summary Judgment, pp. 2–4.

comply with its own Hurricane Questionnaire Plan constitutes a breach of warranty that voids coverage under the Policy.

As Prestige acknowledges, Pensacola, Florida is no stranger to tropical storms and hurricanes.  Boat owners in the Pensacola area certainly know they need to make efforts to protect their vessels when storms approach.  Boats are not like houses; they can be moved, and Prestige specifically chose to adopt a Hurricane Questionnaire Plan requiring the vessel would be "ashore" in the event of a "storm warning." Specifically, the LEGAL LIMITS would be taken to Pensacola Shipyard or Bahia Mar Marina, hauled out and stored ashore, or taken to Bon Secour or some other safe location and properly anchored, or trailered and driven a safe distance away. Prestige acknowledges it did nothing to comply with the Hurricane Questionnaire Plan, ostensibly because of safety reasons.

Hurricane Sally struck the Pensacola, Florida area at approximately 4:45 a.m. on Wednesday, September 16, 2020. This was approximately seven (7) weeks after the subject Insurance Policy had incepted and provided coverages for the M/V LEGAL LIMITS pursuant to the aforementioned insuring terms, conditions, provisions, warranties, endorsements, and exclusions.

Prestige received notice of the subject storm on Saturday September 12, 2020, some ninety-six (96) hours before Sally struck the Pensacola area.  A tropical storm warning was issued at 8:00 a.m. on Sunday, September 13, 2020.  That warning

5

clearly triggered the Hurricane Questionnaire Plan, and Captain Powers admitted that safety would not have prevented moving the vessel on the 13th. Prestige admits it took no action to comply with Plan A or Plan B of the Hurricane Questionnaire Plan on September 13th. Prestige essentially took <u>no</u> action to protect the M/V LEGAL LIMITS until it made feeble attempts on Monday afternoon, September 14, 2020. (Adding extra lines, but leaving the vessel in its permanent moorage at Palafox Marina.)[5] Prestige did not comply with either Plan A or Plan B of the Hurricane Questionnaire Plan.

---

[5] R. Doc. 31-2, Deposition Testimony of Captain Joseph Lance Powers, operator for the M/V LEGAL LIMITS, taken on May 24, 2021, pg. 48, lns. 18-24; pg. 49, lns. 8-22; pg. 97, lns. 10-14.

> Q:  And, in fact, on September 12th, this is like at 3:27 p.m., Marina Management sent an email, correct?
> A:  Yes, sir.
> Q:  And the subject of it is Tropical Storm Sally?
> A:  Yes, sir.
>             *        *        *
> Q:  It says, "We should be prepared for at least tropical storm conditions and possibly hurricane-force winds."
> A:  Yes, sir.
> Q:  And you received this email on September 12th?
> A:  Yes, sir.
> Q:  And you did not take any actions to prepare for at least tropical storm conditions at the time?
> A:  No, sir.
> Q:  You agree with me?
> A:  Yes, sir.
>             *        *        *
> Q:  Okay.  Is there anything in the Hurricane Questionnaire Plan that says that the vessel will be left at the marina and you'll just add some more lines that you think are sufficient?
> A:  No, sir.

The Policy itself provides that well-established, entrenched principles and precedents of substantive United States Federal Admiralty law and practice should apply, but where no such well-established, entrenched precedent exists, the substantive laws of the State of New York apply.[6]

While Prestige contends that Florida law should apply, Prestige is mistaken. Admiralty principles dictate that choice of law provisions in a maritime contract should be upheld unless the application of the clause is "unjust and unreasonable." Here, Great Lakes demonstrated in its own Memorandum of Authorities in support of its Motion for Summary Judgment that Great Lakes maintains sufficient contacts with the State of New York. In particular, Great Lakes maintains an agent for service of process in New York; it maintains its trust accounts in New York; and it was first approved as a surplus line insurer in the State of New York. Per the Declaration of Anthony Usher, representative of Great Lakes, attached as Exhibit "D" to Great Lakes' Memorandum of Authorities in support of its Motion for Summary Judgment,[7] it is clear that New York is not an unjust or unreasonable choice of law for interpretations concerning this maritime contract. Under New York law, warranties are strictly construed and must be strictly complied with, or coverage is

---

[6] R. Doc. 31-1, pg. 10.
[7] R. Doc. 31-5.

7

voided. Since Prestige acknowledges that it did not comply with the Hurricane Questionnaire Plan, there is no coverage.

In sum, Prestige wrote the Hurricane Questionnaire Plan and submitted it to Great Lakes so that Great Lakes would rely upon same and agree to bind and issue coverages for the M/V LEGAL LIMITS.  Sally was a named storm with watches and warnings that had the possibility of impacting Pensacola as early as September 12th and 13th, but Prestige failed to comply with its own Hurricane Questionnaire Plan. That Hurricane Questionnaire Plan was a warranty that is to be strictly construed and must be strictly complied with.  Prestige had a ninety-six (96) hour notice of Sally but did <u>nothing</u> for almost sixty (60) hours.  Under New York law, there is no coverage under this Policy for the constructive loss of the M/V LEGAL LIMITS, and Prestige's Motion for Summary Judgment must be denied, with Great Lakes' Motion for Summary Judgment being granted. This Policy is void *ab initio.*

**II.**
**OBJECTIONS AND REBUTTAL TO**
**PRESTIGE'S STATEMENT OF FACTS**

Prestige argues that the Hurricane Questionnaire Plan could not be safely implemented. But that is not true. Applying the plain, unambiguous wording of the Hurricane Questionnaire Plan, Prestige was required to take action to comply by Sunday, September 13, 2020, when the tropical storm warning was issued for an area that included Pensacola.  This was almost seventy-two (72) hours before Sally

struck the Pensacola area.  Prestige admits it did nothing at that time.[8]   There was

plenty of time for Prestige to begin making arrangements to comply with either Plan

A or Plan B of the Hurricane Questionnaire Plan; however, Prestige did neither.[9]

Captain Powers admits that he was aware of the storm that weekend and

acknowledged that he received the Marina Management email about getting

reservations for haul outs (which would be Pensacola Shipyard or Bahia Mar Marina

under Plan A of the Hurricane Questionnaire Plan).  However, Captain Powers made

no attempts or efforts that weekend to put either Hurricane Questionnaire Plan A or

B into action to effectuate a haul out.[10]  If Captain Powers had complied with Plan

A or Plan B, the vessel would have been saved.[11]  Simply tying up the vessel at its

---

[8] R. Doc. 31-2, Exhibit A, Deposition Testimony of Captain Joseph Lance Powers, previously mentioned in footnote 5.

[9] See, Exhibit A, Expert Report of Revel Boulon, pg. 4,

> On September 13, 2020, approximately 72 hours prior to landfall, the vessel location was upgraded to a tropical storm warning, and the Al Fl border was upgraded to a hurricane warning, with no apparent action taken by the assured to schedule the vessel to be hauled out or to relocate it to sheltered waters as per the backup plan.

While Mr. Boulon was mistaken about whether Prestige took any action on Monday, September 14, 2020, (because of incorrect information produced by Prestige), the fact remains that Prestige did nothing on Sunday, September 13, 2020, or in the early morning hours of Monday, September 14, 2020, to protect the vessel.

[10] See footnote 5.

[11] R. Doc. 31-3, Deposition Testimony of Tammy Blackwell of Pensacola Shipyard, May 25, 2021, pg. 27, lns. 20-22; and pg. 28, lns. 1-7:

> Q:   I'm trying to get an idea if any damage actually happened to one of the vessels that was—while it was ashore.
> A:   Are you asking for vessels we hauled out for Hurricane Sally or vessels that were on the yard already?
> Q:   Well, let's start with those you hauled out specifically for Hurricane Sally.
> A:   *So if memory serves me correctly, the answer is no.*

home port of Palafax Marina, when there is clear awareness of a tropical storm warning that included Pensacola, does not comply with Prestige's Hurricane Questionnaire Plan.[12]

In sum, Captain Powers had sufficient time before the afternoon of Monday, September 14, 2020, to make arrangements for a haul out and /or to safely navigate the approximate five miles to Pensacola Shipyard or Bahia Mar Marina for the haul out. He chose to do nothing.  Making phone calls on the afternoon of Monday, September 14, 2020, was insufficient to comply with Plan A or Plan B of the Hurricane Questionnaire Plan.

This insurance Policy was in effect less than two months before Hurricane Sally struck the Pensacola area and allegedly caused a constructive loss to the M/V LEGAL LIMTS. Given the propensity of storms in the Pensacola area, no insurer would ever issue a policy providing Hull coverage to a yacht in the Pensacola area without the insured agreeing to comply with its own Hurricane Questionnaire Plan. That is what Prestige said it would do. However, that is not what Prestige actually did when faced with Sally.  Instead, it added a few lines, hoped for the best, and when the vessel suffered a constructive loss, told Great Lakes to "pay up" even though Prestige knew it failed to comply with its own Hurricane Questionnaire Plan.

---

[12] Captain Powers admitted in his deposition that leaving the vessel at Palafox Marina and adding lines was not part of the Hurricane Questionnaire Plan.  See footnote 5.

Prestige's failure to comply with the Hurricane Questionnaire Plan voids the insurance coverage under New York law, and this Court should declare the Policy to be void *ab initio*.

### III.
### APPLICABLE LAW

**A.**   **New York Law Applies – The Hurricane Questionnaire Plan Was A Warranty, And Prestige's Breach Voids Coverage**

Prestige argues that New York law does not apply.  But Prestige is wrong. Great Lakes cited the Court to the applicable law in its own Memorandum of Authorities in support of its Motion for Summary Judgment.[13]  While Great Lakes will not repeat that detailed discussion, it will mention some of the well-founded principles as found in those cases and reference some additional cases in rebuttal to Prestige's arguments.

*Great Lakes Reinsurance (UK) PLC v. Rosin*, 757 F. Supp. 2d 1244, 1251 (S.D. Fla. 2010) is a seminal case in this area. It involved a breach of a named operator warranty. The policy in that case also stated that "any dispute arising hereunder shall be adjudicated according to well established, entrenched principles and precedents of substantive United States Federal Admiralty law and practice but

---

[13] R. Doc. 31-1.

where no such well-established, entrenched precedent exists, this insuring agreement is subject to the substantive laws of the State of New York." *Id*, at 1247.[14]

*Rosin* found that New York had a sufficient substantial relationship with Great Lakes to allow the application of New York law and enforce the parties' choice of law clause. The court there essentially emphasized the same factors as in the Usher Declaration here, namely, that Great Lakes first applied to be a surplus lines carrier in New York; Great Lakes maintains bank accounts in New York; Great Lakes accepts service of process through attorneys in New York; and the choice of law provision in the insurance policy specifies the applicability of New York law. *Id*, at 1251. *Rosin* also emphasized the principles as stated in *Great Lakes Reinsurance (UK) PLC v. Durham Auctions, Inc.*, 585 F.3d 236, 242 (5th Cir. 2009). *Durham* likewise enforced a choice of law clause adopting New York law in a marine insurance policy, because Great Lakes had a substantial relationship with New York, maintained an agent in New York for service of process, and kept its bank accounts in New York.

> "Durham has not carried its burden of showing that the application of New York, as provided in the Policy, would be unreasonable or unjust."; *Id*, at 244; *see also*, *Great Lakes Reinsurance (UK) PLC v. Sea Cat I, LLC,* 653 F. Supp. 2d 1193, 1199 (W.D. Okl. 2009) (applying choice of law clause in the marine insurance policy issued by Great Lakes specifying admiralty law or New York law); *Great Lakes Reinsurance (UK) PLC v. Dion,* 2009 WL 5174372, *2 (S.D. Cal.

---

[14] This is the same choice of law provision as in the Policy here.

2009); and *Great Lakes Reinsurance (UK) PLC v. S. Marine Concepts, Inc.,* 2008 WL 6523861, at *2 (S.D. Tex. 2008).

All of these cases held that the choice of law provision in the marine insurance contract providing that New York law would apply was entirely reasonable under the circumstances. Great Lakes had sufficient contacts with the State of New York for the application of New York law to be both reasonable and just, and most importantly, had "substantial assets and connections in New York…." *Id.*

Similarly, New York law should apply here. The principles of admiralty dictate that a party's choice of law provision should be upheld.[15]  This is the same choice of law provision upheld by federal courts in Florida, the Fifth Circuit, and even state courts.  The application of New York law is not unreasonable nor unjust. This Court should also find that New York law applies to the interpretation of this marine insurance contract.

Under New York law, warranties in marine insurance policies are strictly construed and must be strictly complied with, or there is no coverage for a loss to a vessel. See *Commercial Union Ins. v. Flagship Marine Services*, 190 F.3d 26 31-32 (2d Cir. 1999), stating,

> "Under the federal rule and the law of most states, warranties in maritime insurance contracts must be strictly complied with, even if they are collateral to the primary risk that is the subject of the contract, if the insured is to recover." *Id*, at 31. *See also*, *Levine v. Aetna Ins.*

---

[15] *Albany Ins. Co. v. Kieu*, 927 F.2d 882, 890 (5th Cir. 1991); *Great Lakes v. Durham*, at 241-42. See also, Restatement (Second) of Conflict of Laws § 187-188.

*Co.*, 139 F.2d 217, 218 (2d Cir. 1943) (*per curiam*) (interpreting predecessor statute to N.Y. Ins. L.S 3106(c) and holding that, "compliance with the warranty was a condition precedent to liability [under the contract of marine insurance] and afforded a complete defense irrespective of any question of causation"); *Adrani Enterprises, Inc. v. Underwriters at Lloyds*, 962 F.Supp. 415, 419-20 (S.D.N.Y. 1997), vacated on other grounds, 140 F.3d 157 (2d Cir. 19998) (New York Ins. L. S. 3106, like the federal rule, requires strict compliance with warranties in marine insurance contract).

Prestige has admitted that it failed to comply with the Hurricane Questionnaire Plan, which is a warranty under the Policy. *Kephart v. Certain Underwriters at Lloyds of London*, 427 F.Supp.3d 508 (S.D.N.Y. 2019) is the leading case on the necessity to comply with the Hurricane Questionnaire Plan. The insured there argued that since the vessel was hauled out of the water before the storm, it had complied with the Hurricane Questionnaire Plan. But the court found there were other elements of the Hurricane Questionnaire Plan the insured failed to satisfy. Specifically, the insured not only had to haul the vessel out of the water, it also had to tie it down. While the insured argued ambiguity in the Hurricane Questionnaire Plan, the Court soundly rejected such.

> Kephart's argument that the haul out provision in Section 7 governs this dispute and creates ambiguity is rejected . . . Because Kephart breached the unambiguous terms of the HPP [Hurricane Questionnaire Plan], a warranty that must be strictly complied with under maritime insurance law, he is not entitled to coverage under the policy for damage incurred on or around September 10, 2017.

*Kephart v. Certain Underwriters*, at 517.

14

**B.**   **This Hurricane Questionnaire Plan Is Not Ambiguous**

Prestige argues that the Hurricane Questionnaire Plan is ambiguous.  It is not. Words of a policy are not ambiguous when they are given their plain, ordinary and generally accepted meaning:  "that a provision is complex and requires analysis for application does not automatically mean it is ambiguous." *Geico Marine Ins. Co. v. Shackleford*, 945 F.3d 1135, 1140 (11th Cir. 2019) (quoting from *Swire Pac. Holdings, Inc. v. Zurich Ins. Co*. 45 So.2d 161, 165-66 (Fla. 2003)).  Even when a provision is not a defined term in the policy, it simply carries its ordinary meaning. *Id*, at 1141. *See also*, *Arguelles v. Citizens Prop. Ins. Corp.*, 278 So. 3d 108, 111 (Fla. Dist. Ct. App. 2019). "In the absence of ambiguous language, a court may not look to parol evidence in ascertaining the intent of parties to an insurance contract." *Oretsky v. Infinity Ins. Co.*, 524 Fed. App'x 517, 523 (11th Cir. 2013) (quoting from *Fireman's Fund Ins. Co. v. Tropical Shipping & Construction Co*., 254 F.3d 987, 1003 (11th Cir. 2001)).

The words in the Policy are to be given their plain meaning; nothing more and nothing less. Further, considering that Prestige wrote the Hurricane Questionnaire Plan, it should arguably be construed against them.  The tropical storm warning for Pensacola on Sunday, September 13, 2020, at 8:00 a.m., triggered the Hurricane Questionnaire Plan under its plain meaning.

The Hurricane Questionnaire Plan here is straightforward, not complex, and easy to understand and interpret. When storm watches and warnings potentially threatened the general Pensacola area, the Hurricane Questionnaire Plan was clearly triggered. The precise triggering language is straightforward: "in the event of a storm warning" and "in the event of a tropical storm or hurricane." But Prestige failed to act. It did not implement Plan A or Plan B. This failure was a breach of warranty that abrogates coverage. The Policy must be declared void *ab initio*.

## C. Even Under Florida Law, Prestige's Breach Of The Hurricane Questionnaire Plan Warranty Increased The Hazard/Risk And Vitiates Coverage

While Great Lakes contends that Florida law does not apply, even under Florida law, Prestige's lack of required action increased the hazard and the risk, such that coverage is still vitiated. Fla. Stat. § 627.409(2) provides:

> A breach or violation by the insured of any warranty, condition or provision of any wet marine or transportation insurance policy, contract of insurance, endorsement or application therefore does not void the policy or contract, or constitute a defense to a loss thereon, unless such breach or violation increased the hazard by any means within the control of the insured.

*Id*; *See also*, *AXA Global Risks (UK), Ltd. v. Webb*, 2000 WL 33179617 (M.D. Fla., July 28, 2000).

In *AXA Global Risks*, the insured had his vessel docked in the water at his residence as opposed to being laid-up during the winter as required by the policy. The court found the breach of the lay-up clause to have increased the hazard. If the

16

vessel had been laid-up as required, it would not have sunk. The court invalidated the policy based upon the breach of warranty.

Likewise, *Firemans's Fund Ins. Co. v. Cox*, 742 F. Supp. 609 (M.D. Fla. 1989), found that the presence of extra crew members on board also increased the hazard, and that policy was declared void. *Great Lakes Reinsurance (UK) PLC v. Rosin*, 757 F. Supp. 2d 1244 (S.D. Fla. 2010), involved the breach of the named operator warranty.  Although the court ultimately concluded that New York applied, it also found that even under Florida law, the breach of warranty caused by the operator's negligence increased the hazard and was the cause of the loss. Coverage was voided.

Finally, *Commercial Union Ins. Co. v. Flagship Marine Services*, 190 F. 3d 26, 32-33 (2d Cir. 1999), found that while New York law should apply, even under Florida law, the violation of the Tow Warranty was a material breach that obviated coverage.

*Travelers Property Casualty Co. of N. America v. Ocean Reef Charters, LLC*, 996 F. 3d 1161, 1170 (11th Cir. 2021), acknowledged that some warranties are not subject to Fla. Stat. § 627.409(2) under Florida law. (Navigational warranties). In fact, some warranties are subject to federal maritime law interpretation, which, like New York law, requires strict conformity and compliance, or coverage is voided. *Travelers,* at 1168; *Lexington v. Cooke's Seafood*, 835 F.2d 1364 (11th Cir. 1988);

and *Aetna Ins. Co. v. Dudney*, 595 So. 2d 238, 239 (Fla. App. 4 Dist. 1992). Of

interest is *AIG Centennial Ins. Co. v. O'Neill*, 782 F. 3d 1296, 1304 (11th Cir. 2015),

which held that federal maritime doctrines could apply as to determinations on

ambiguity, finding that the maritime doctrine of *uberrimae fidei* — not state contract

law -- would govern the maritime insurance dispute. *See also*, *HIH Marine Services,*

*Inc. v. Fraser*, 211 F.3d 1359, 1362 (11th Cir. 2000) and *SteelMet, Inc. v. Caribe*

*Towing Corp.*, 747 F.2d 689, 695 (11th Cir. 1984), finding that the "well settled

principle of *uberrimae fidei* is the controlling law of [11[th]] this Circuit."

> "By default, federal maritime law displaces contrary state law when
> construing a marine insurance contract." *Geico Marine Ins. Co. v.*
> *Shackleford*, 945 F. 3d 1135, 1143 (11th Cir. 2019).  "The parties could
> have included a choice-of-law provision selecting state law over federal
> law, but they did not. And "we may not rewrite [the parties'] contract,
> add meaning that is not present, or otherwise reach results contrary to
> the intentions of the parties." *Id*. (quoting from *Taurus Holdings, Inc.*
> *v. U.S. Fid. v. Guar. Co.*, 913 So. 2d 528, 532 (Fla. 2005)).

So no matter what law actually applies, Prestige failed to comply with its own

Hurricane Questionnaire Plan, refused to take the necessary action under Plan A or

Plan B until it was too late, and now wants its lack of action excused. But the law

clearly does not allow for such abject failures to be excused. Prestige was required

to take certain actions that weekend. Prestige's failure to do so increased the hazard

and risk to the M/V LEGAL LIMITS such that here is no coverage under the Policy.

 While Prestige now tries to claim that this was a "technical omission" and

that Fla. Stat. § 627.409(2) justifies such "technical omission", Prestige's admitted

failure to comply with the warranty voids coverage. Furthermore, Prestige's breach increased the hazard the vessel faced. If Prestige had complied with either Plan A or Plan B, either by navigating the vessel to Pensacola Shipyard or Bahia Mar Marina for "haul out" or driven the vessel a safe distance away from the storm, the M/V LEGAL LIMITS would not have suffered damage.[16]  Because Prestige did not comply, the vessel suffered a constructive total loss. This could not be more plain. Prestige's failure to comply with its own Hurricane Questionnaire Plan increased the hazard to the subject vessel that was insured.

**D.**   **The Hurricane Questionnaire Plan Was Breached By Prestige, Such Breach Increased The Hazard, And The Policy Is Void Under New York, Florida, And Federal Law**

It was certainly not unreasonable to require Prestige to comply with its own Hurricane Questionnaire Plan based on the 8:00 a.m., Sunday, September 13, 2020, tropical storm warning for the Pensacola area. There is nothing in the Hurricane Questionnaire Plan regarding an analysis of a "cone of uncertainty."  This is a "red herring" issue raised by Prestige.  Instead, the plain meaning of the language in the Hurricane Questionnaire Plan requires that when there is a named storm that potentially impacts the vessel's location—especially with a tropical storm warning—action must be taken. Prestige's failure to do so voids coverage.

---

[16] See footnote 10.

While this Court should apply New York law, Prestige's failure to comply with the Hurricane Questionnaire Plan clearly increased the hazard and risk of Hurricane Sally such that even if this Court applies Florida law and specifically, Fla. Stat. § 627.409(2), coverage is void.  See e.g., *AXA Global Risks (UK), Limited v. Webb*, 2000 WL 33179617 (M.D. Florida, July 28, 2000). The court there found that even under Florida law and even under the Fla. Stat. § 627.409(2),

> The breach and misrepresentation established here did increase the hazard insured against… Here, at the time the vessel sank, the insured represented that it would be on shore, and it was not. Thus, Section 627.409 (2) is not a bar to AXA's right to have the Policy declared void. *Id*, at *23. *See* also, *Fireman's Fund Ins. Co. v. Cox,* 742 F. Supp. 609 (M.D. Florida 1989) (finding that presence of additional crew members on board of the vessel did increase the hazard). *Id.*, at *2-3.

On a final note, Prestige offers the argument that this was an inevitable and unavoidable accident or act of God, while admitting that such is an extremely heavy burden of proof on the insured. But that is a tort principle, not a contract principle. Simply put, an Act of God is a defense to a tort, not a defense by the insured to its failure to comply with its warranty.

In sum, Prestige should have begun to comply with its Hurricane Questionnaire Plan no later than 8:00 a.m. on Sunday, September 13, 2020, when a tropical storm warning was issued for an area that included Pensacola.  Prestige's complete and utter failure to comply with either Plan A or Plan B of its own

Hurricane Questionnaire Plan voids coverage in this matter for the subject vessel.

This Court must declare the Policy to be void *ab initio*.

## IV.
## CONCLUSION

Some important points here are undeniable:

1. The Hurricane Questionnaire Plan is a warranty that was an integral part of the Policy.

2. The Hurricane Questionnaire Plan is to be interpreted under New York law.

3. Under New York law, warranties are strictly construed and are to be strictly complied with under the circumstances.

4. Prestige admits it failed to comply with its own Hurricane Questionnaire Plan.

5. Prestige tries to offer an excuse, but its failure to comply with either Plan A or Plan B of its Hurricane Questionnaire Plan voids coverage, and this Court should declare the Policy to be void *ab initio*.

This Court should deny Prestige's Motion for Summary Judgment and grant

Great Lakes' Motion for Summary Judgment.

Dated:         August 27, 2021.

Respectfully submitted,

LUGENBUHL, WHEATON, PECK, RANKIN &
      HUBBARD, A LAW CORPORATION

By:   */s/ Todd G. Crawford*
        Todd G. Crawford (MBN 102620)
        LUGENBUHL, WHEATON, PECK,
        RANKIN & HUBBARD
        2501 14th Street, Suite 202
        Gulfport, Mississippi 39501
        Telephone:  (228) 206-0033
        E-Mail:  tcrawford@lawla.com
        *Attorney for Plaintiff*

## CERTIFICATE OF COMPLIANCE

In compliance with Local Rule 7.1(F), I hereby certify that the foregoing Memorandum in Support of Plaintiff's Motion for Summary Judgment contains a total of 5172 words, inclusive of all allowable exclusions.

*/s/ Todd G. Crawford*
Todd G. Crawford

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Memorandum was served on all counsel of record via the Court's CM/ECF filing system on this the 27th day of August, 2021.

*/s/ Todd G. Crawford*
Todd G. Crawford