IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

GREAT LAKES INSURANCE, S.E.,

      Plaintiff,

v.

PRESTIGE WORLDWIDE
PENSACOLA CHARTERS, LLC
D/B/A LEGAL LIMITS OUTDOORS.

      Defendant.

Civil Action No.
3:20-cv-05954-RV-HTC

_____/

## **DEFENDANT PRESTIGE WORLDWIDE PENSACOLA CHARTERS, LLC'S RESPONSE TO PLAINTIFF GREAT LAKES INSURANCE S.E.'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

I.   STATEMENT OF FACTS……………………………………………..6

II.   SUMMARY JUDGMENT STANDARD……………………………..13

III.   ARGUMENT…………………………………………………………..14

    A. Florida Law, as Opposed to New York Law, Should Supplement Maritime Law in This Case……………………………………..15

    B. Under Florida Law, Prestige did Not Breach the HQP…………18

    C. Even if New York Law Applies, Great Lakes is Not Entitled to Summary Judgment…………………………………………..24

    D. Prestige's Claims for Breach of Contract and Breach of the Implied Covenant of Good Faith and Fair Dealing Are Valid….28

IV.   CONCLUSION……………………………………………………...30

# TABLE OF AUTHORITIES

<u>**Cases**</u>                                                                                                 <u>**Pages**</u>

*Aetna Ins. Co. v. Houston Oil & Transport Co.*, 49 F.2d 121, 123 (5th Cir. 1931)…23

*Aguirre v. Citizens Casualty Company of New York*, 441 F.2d 141, 143 (5th Cir. 1971), *cert. denied*, 404 U.S. 829 (1971)……………………………………………18

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)………………………14

*Barracuda, LLC v. GEICO Marine Ins. Co.*, 464 F. Supp. 3d 1264, 1266 (M.D. Fla. 2020)……………………………………………………………………………..14, 15

*Beazley Ins. Co., Inc. v. ACE Am. Ins. Co.*, 880 F.3d 64, 68 (2d Cir. 2018)………24

*Burklow & Assoc., Inc. v. Belcher*, 719 So. 2d 31, 36 (Fla. 1st DCA 1998)………17

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)…………………………………14

*Eagle Star Ins. Co. Limited of London, England v. Ross*, 247 So. 2d 514, (Fla. 3d DCA 1971)……………………………………………………………………………...23

*Fireman's Fund Ins. Co. v. Cox*, 742 F. Supp. 609, 611 (M.D. Fla.), *aff'd*, 892 F.2d 87 (11th Cir. 1989)……………………………………………………………………...20

*F.W.F., Inc. v. Detroit Diesel Corp.*, 494 F. Supp. 2d 1342, 1355 (S.D. Fla. 2007), *aff'd*, 308 F. App'x 389 (11th Cir. 2009)…………………………………………….17

*GEICO Marine Ins. Co. v. Shackleford*, 945 F.3d 1135, 1140 (11th Cir. 1990)……21

*Great Lakes Reinsurance (UK) PLC v. Durham Auctions, Inc.*, 585 F.3d 236 (5th Cir. 2009)…………………………………………………………………………15-16

*Great Lakes Reinsurance (UK), PLC v. Rosin*, 757 F. Supp. 2d 1244, 1251 (S.D. Fla. 2010)…………………………………………………………………………16, 20, 24

*Hilton Oil Transport v. Jonas*, 75 F.3d 627, 630 (11th Cir. 1996)…………………18

*Holdings v. Aspen Am. Ins. Co.*, 2020 WL 7237259, at *1 (N.D. Fla. Sept. 1,

2020)……………………………………………………………………………20

*In re MPM Silicones*, 874 F.3d 787, 795 (2d Cir. 2017)…………………………..27

*Irwin v. Eagle Star Ins. Co.*, 455 F.2d 827, 830 (5th Cir. 1972)……………………17

*Jarvis Towing & Transp. Corp. v. Aetna Ins. Co.*, 298 N.Y. 280, 82 N.E.2d 577, 577 (1948)……………………………………………………………………………...24

*Jimenez v. Gov't Empls. Ins. Co.*, 2014 WL 5810466, at *4 (M.D. Fla. Nov. 7, 2014)…………………………………………………………………………29

*Kephart v. Certain Underwriters at Lloyd's of London*, 427 F. Supp. 3d 508, 515 (S.D.N.Y. 2019)………………………………………………………..24, 25, 26, 27

*Lexington Ins. Co. v. Cooke's Seafood*, 835 F.2d 1364, 1366-67 (11th Cir. 1988)..18

*Olin Corp. v. OneBeacon Am. Ins. Co.*, 864 F.3d 130, 147 (2d Cir. 2017)…………27

*Pickett v. Woods*, 404 So. 2d 1152, 1153 (Fla. 5th DCA 1981)……………………20

*Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006)………………………………14

*Pozzi Window Co. v. Auto–Owners Insurance Inc.*, 446 F.3d 1178 (11th Cir. 2006)……………………………………………………………………………29

*RMI Holdings v. Aspen Am. Ins. Co.*, 2020 WL 6749042, at *3 (N.D. Fla. July 15, 2020)……………………………………………………………………………17

*Serendipity at Sea, LLC v. Underwriters at Lloyd's of London Subscribing to Policy Number 187581*, 2021 WL 1348435, at *6 (S.D. Fla. Feb. 5, 2021)………………19

*Skandia Ins. Co. v. Star Shipping AS*, 173 F. Supp. 2d 1228, 1239-40 (S.D. Ala. 2001)……………………………………………………………………………20

*St. Paul Fire and Marine Ins. Co. v. Lago Canyon, Inc.*, 561 F.3d 1181, 1184 (11th Cir. 2009)……………………………………………………………………………15

*Stoot v. Fluor Drilling Services, Inc.*, 851 F.2d 1514, 1517 (5th Cir. 1988)……….16

*Swire Pac. Holdings, Inc. v. Zurich Ins. Co.*, 845 So. 2d 161, 165 (Fla. 2003)..21, 22

*Taurus Holdings, Inc. v. U.S. Fid. & Guar. Co.*, 913 So. 2d 528, 532 (Fla. 2005)…22

*Travelers Prop. Cas. Co. of Am. v. Ocean Reef Charters LLC*, 996 F.3d 1161 (11th Cir. 2021)……………………………………………………………………...18, 19

*Wilburn Boat Co. v. Fireman's Fund Ins. Co.*, 348 U.S. 310, 313 (1955)………….19

## **Statutes**

Fla. Stat. § 327.59(1)……………………………………………………...17, 18, 20, 23

Fla. Stat. § 624.155(1)(b)(1)………………………………………………………….29

Fla. Stat. § 627.409(2)……………………………………………………………19, 20

## DEFENDANTS PRESTIGE WORLDWIDE PENSACOLA CHARTERS, LLC'S MEMORANDUM OF LAW IN RESPONSE

COMES NOW, Defendant Prestige Worldwide Pensacola Charters, LLC ("Defendant" or "Prestige"), and responds to Plaintiff Great Lakes Insurance S.E.'s ("Plaintiff" or "Great Lakes") Motion for Summary Judgment. (Doc. # 31). The parties filed cross motions for summary judgment on August 9, 2021. (*See* Docs. # 31, 32). For the reasons set forth below, Prestige respectfully requests that the Court deny Plaintiff's Motion for Summary Judgment and grant Prestige's Motion for Summary Judgment.

Prestige notes that much of Plaintiff's Motion is addressed in its cross Motion for Summary Judgment. (Doc. # 32-1). Notwithstanding, Prestige will respond in full to Plaintiff's Motion.

## I.   STATEMENT OF FACTS

Defendant Prestige owns and operates Legal Limits, a 2014 34-foot Boston Whaler with Mercury triple 300hp gas engines, BWCE1025B414 ("the Vessel"). The Vessel's home port was Palafox Pier & Yacht Harbour Marina ("Palafox Marina"), located at 997 South Palafox St., Pensacola, Florida 32502.

On August 7, 2020, Prestige entered into an "all risk" insurance agreement

(policy number CSRYP/184311) with Great Lakes.[1]  The policy is effective from August 7, 2020 to August 8, 2021.[2]  The policy provides Hull coverage up to $325,000.00, subject to certain exclusions, warranties, and other provisions, and it also provides coverage for named or numbered windstorms, subject to a deductible of $16,250.00.

As part of the application for insurance, Prestige was required to fill out a Hurricane Questionnaire/Plan ("HQP") that provided the steps to be taken should a named or numbered windstorm (*i.e.*, tropical storm or hurricane) be forecasted to hit Pensacola, Florida.  The HQP proposed two potential courses of action: (A) "[i]n the event of a tropical storm or hurricane[,] the vessel will be stored ashore at the Pensacola shipyard or BahiaMar Marina and prepped for the storm.  The vessel will be on the list to [be] pulled 48 [hours] before the storm approaches land;" or (B) "[i]n the event that the vessel is unable to be stored ashore in the marinas [listed] above in plan A[,] the vessel will be driven a safe distance away and stored at a marina or the vessel will be taken to Bon Secour and anchored in a safe location with multiple anchors along with being tied up to pilings to ride out the storm."[3]

---

[1] An "all risk" policy "covers you for any loss and or damage to your vessel that is accidental, fortuitous in nature[,] and is incidental to the use of your vessel."  *See* Doc. # 32-3 (Insurance Agreement between Prestige Worldwide Pensacola Charter LLC, Great Lakes Insurance, S.E., and non-party Concept Special Risks, Ltd.).

[2] *See* Doc. # 32-3 (Insurance Agreement between Prestige Worldwide Pensacola Charter LLC, Great Lakes Insurance, S.E., and non-party Concept Special Risks, Ltd.).

[3] *See* Doc. # 32-4 (Hurricane Questionnaire/Plan).

On Friday, September 11, 2020, the National Hurricane Center ("NHC") identified Tropical Depression Nineteen in the Atlantic Ocean.[4]  By 5:00 PM on Saturday, September 12, 2020, a Hurricane Watch was issued from Grand Isle, Louisiana to the Alabama/Florida border, while a Tropical Storm watch was issued for the Alabama/Florida Border to Indian Pass, Florida.[5]

Around 8:00 AM on Sunday, September 13th, a tropical storm warning was issued for Pensacola, Florida and surrounding areas.[6]  Notwithstanding, the storm's forecasted track had shifted farther west into Louisiana.[7]  Thirteen hours later, the cone's shape had again shifted to the west.  It was not until the 10:00 PM advisory on Sunday, September 13th that the projected path (along with the cone of uncertainty) shifted east towards Pensacola, Florida.[8]

Notably, it was not until Monday, September 14, 2020 at 11:00 AM that the storm developed into a hurricane (*i.e.*, Hurricane Sally).[9]  At this time, the Alabama/Florida Border to Indian Pass, Florida was under a Tropical Storm warning

---

[4]   *See* National Oceanic and Atmospheric Administration ("NOAA"), located at https://www.nhc.noaa.gov/archive/2020/SALLY.shtml.
[5] *See SALLY Graphics Archive: 3-day Forecast Track, Initial Wind Field and Watch/Warning Graphic*, NAT'L HURRICANE CTR. AND CENTRAL PACIFIC HURRICANE CTR, NAT'L OCEANIC & ATMOSPHERIC ADMIN. (n.d.), https://www.nhc.noaa.gov/archive/2020/SALLY_graphics.php?product=3day_cone_no_line_and_wind.
[6] *See supra* note 4.
[7] *See supra* note 5.
[8] *See supra* note 5.
[9] *See supra* note 4.

(which includes Pensacola, Florida),[10] and Morgan City, Louisiana to the Alabama/Florida border was under a hurricane warning.[11]   By the evening of Monday, September 14, 2020, Hurricane Sally's outer bands were already pounding Pensacola Beach,[12] and the increasing strength of Hurricane Sally could be felt and seen in Pensacola Bay.[13]

In the days/hours before it made landfall, Hurricane Sally proved difficult to track due to "weak steering currents and [its] slow movement."[14]   Not only did a majority of the forecast tracks place Hurricane Sally making landfall in Mississippi or Louisiana,[15] but by the time it made landfall, Hurricane Sally was moving at a pace of two to three MPH.[16]   This made preparing for the storm extremely difficult for home owners and boat owners alike, because the forecast was unusually volatile. In fact, the Pensacola Shipyard—where Prestige was to have Legal Limits hauled out in the event of a storm—did not believe it necessary to initiate its Hurricane Haulout Priority Program[17] "[b]ecause it didn't look like it was coming [to

---

[10] *Id.*  Pensacola, Florida is between the Alabama/Florida border and Indian Pass, Florida.

[11] *Id.*

[12]     @jpainefrommaine, Twitter (Sept. 14, 2020, 6:31 PM), https://twitter.com/jpainefrommaine/status/1305650507827105800.

[13] *See supra* note 4 (in the 10:00 PM advisory, it noted: "OUTER RAIN BANDS MOVING ONSHORE IN THE FLORIDA PANHANDLE").

[14] Doc. # 32-2 (Strum Expert Report, at 27 (Exhibit G)).

[15] *Id.*; *see* Doc. # 32-5 (Schiehl Expert Report, at 3).

[16] *Id.* at 2.

[17] The Pensacola Shipyard has a Hurricane Haulout Priority Program that is essentially a program where a member could purchase a "time slot" to have his/her vessel hauled out in the event of a hurricane or tropical storm.  Each member of this program would still have to pay to have their

Pensacola, Florida]. . . . [I]t looked like it was going . . . further to the west.  We thought we would have some impact but not a direct hit, which is why we took . . . voluntary calls."[18]

Joseph Lance Powers is the captain of Legal Limits, the subject vessel.  He has held his captain's license for over 15 years, and he has previously captained multiple larger vessels.[19]  Captain Powers first became aware of the formation of then-Tropical Storm Sally on Saturday, September 12, 2020.[20]  Upon learning of the storm's formation—which at that point he recalls it was projected to hit Mississippi or Louisiana—he added lines to the vessel for security and continued to monitor the storm's forecast.[21]  Captain Powers testified that, in his opinion, he "tie[d] up Legal Limits securely enough to withstand tropical storm force[] [winds] on September 12th, as Palafox Marina is located behind a nine-foot seawall and large buildings that could serve as a barrier to much of the south/southeast winds.[22]  "Sometime

---

vessel hauled out, but they would be guaranteed a time slot.  Currently, there are approximately 52 vessels in the program.  In preparation for Hurricane Sally, only seven vessels in the program were hauled out between Sunday, September 13th and Monday, September 14th, and only nine vessels in total (both in the program and outside the program) were hauled out in preparation for Hurricane Sally.  *See* Doc. # 32-6 (Deposition of Tammy Blackwell, dated 5/25/2021, at 35:3-11).  But, only vessels in the program could have been hauled out on Sunday September 13th.  *Id.* at 30:3-19.

[18] Doc. # 32-6 (Deposition of Tammy Blackwell, dated 5/25/2021, at 34:17-24).

[19] Doc. # 32-7 (Deposition of Joseph Lance Powers, dated 5/24/2021, at 7:7-13).

[20] *Id.* at 12:8-25; 13:1-3.

[21] *Id.* at 14:19-21; 36:18-21.

[22] *Id.* at 95:1-7.  Further, as was recently discovered, the seawall meant to protect Palafox Marina is defective and essentially caused the devastation at Palafox Marina.  *See* Jim Little, *$1 million fox: Design flaw in city seawall at Palafox Pier led to destruction in Sally*, PNJ (Aug. 18, 2021,

before noon"[23] on Monday, September 14, 2020,[24] Captain Powers became aware of Hurricane Sally's shift towards Pensacola, Florida.[25]

At this time, Captain Powers attempted to contact the Pensacola Shipyard, pursuant to the HQP, to have Legal Limits hauled out of the water and prepped for the storm. Captain Powers testified that he spoke with a woman at the Pensacola Shipyard who informed him they could not haul Legal Limits out of the water.[26] Notably, Ms. Blackwell testified that the Pensacola Shipyard does not keep records of contact or a contact log for individuals who call about a haul out, whether in preparation for a hurricane or not, so "it is possible" that someone, *i.e.*, Captain Powers, could have called on Monday, September 14th to have Legal Limits hauled out but was refused service.[27]

Importantly, the Shipyard only hauled out three boats on Monday, September 14th, and all three were scheduled for the afternoon. The boats that had been

---

[23] *Id.* at 21:8-15.

[24] Importantly, Plaintiff's expert Revel Boulon wrote his expert report under the assumption that Captain Powers did not contact the Pensacola Shipyard until Tuesday, September 15, 2020. However, this information is incorrect, as Captain Powers testified that he contacted the Pensacola Shipyard on Monday, September 14th—the information in the letter drafted by Holly Dixon, see Doc. # 32-8, was a typographical error. *See* Doc. # 32-7 (Deposition of Joseph Lance Powers, dated 5/24/2021, at 39:14-19).

[25] *Id.* at 21:8-15.

[26] *Id.* at 22:6-10. Moreover, Captain Powers did not contact BahiaMar Marina (as is called for in the HQP) because by the time the Pensacola Shipyard informed him they would not haul Legal Limits out of the water, it was too dangerous to move it anywhere.

[27] Doc. # 32-6 (Deposition of Tammy Blackwell, dated 5/25/2021, at 31:4-21).

previously scheduled for that afternoon would have completely prevented Legal Limits from being hauled out at that time.[28]   The Pensacola Shipyard is approximately five to six miles from Palafox Marina.[29]   Due to the time Captain Powers found out about Hurricane Sally's shifted forecast, even if the Pensacola Shipyard would have been able to haul Legal Limits (assume Captain Powers had that information—which he did not), he likely could not have driven it there in time to have it hauled.

Consequently, in the early afternoon on Monday, September 14, 2020, Captain Powers made the decision, based on his professional judgment and experience, to leave Legal Limits in its home port at Palafox Marina so as to not risk significant bodily injury in trying to relocate it or haul it out of the water pursuant to either Plan A or Plan B in the HQP.[30]   On September 14th and 15th, Captain Powers purchased additional lines and placed them on Legal Limits to attempt to even more firmly secure the boat.[31]   Indeed, he testified that even if the Pensacola Shipyard could have hauled out his boat, he would not have felt safe navigating Legal Limits out of Palafox Marina because of the strong Southeast winds and the way in which Palafox Marina is structured.[32]   To be sure, on Monday, September 14th around

---

[28] *Id.* at 27:2-8; 25:10-25; 26:1-8.
[29] Doc. # 32-7 (Deposition of Joseph Lance Powers, dated 5/24/2021, at 24:16-19).
[30] *Id.* at 23:13-18.
[31] *Id.* at 96:14-21.
[32] *Id.* at 24:8-11; 25:8-12; 30:1-10.

11:56 AM, the weather station at Pensacola NAS showed Pensacola experiencing wind speeds of 26 MPH and wind gusts of 36 MPH.[33]  Thus, Captain Powers took all necessary and reasonable precautions in prepping Legal Limits for Hurricane Sally, including adding multiple additional lines and removing loose items.  As to Captain Powers' actions, Defense expert Richard Schiehl stated:

> In my opinion, given the information provided to vessel owners by Palafox Pier Marina and the inability to get the vessel hauled out ahead of storm landfall, the measures taken by Captain Powers to secure the vessel were reasonable and consistent with actions taken by other vessel owners in the marina and in the region.[34]

On September 16, 2020 around 4:45 AM, Hurricane Sally made landfall in the Gulf Coast.  Along with dozens of other vessels that were also docked at Palafox Marina for the storm, Legal Limits endured hours of battering waves and relentless winds.

On September 18, 2020, after Hurricane Sally had passed and Prestige discovered the damage to Legal Limits, Prestige filed an insurance claim with Plaintiff under the relevant terms of the insurance policy.  On November 23, 2020, Great Lakes denied Prestige's claim.  This lawsuit followed.

## II.    SUMMARY JUDGMENT STANDARD

Under Rule 56, "[t]he court shall grant summary judgment if the movant

---

[33] Doc. # 32-2 (Strum Expert Report, at 10).
[34] Doc. # 32-5 (Schiehl Expert Report, at 2).

shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The moving party bears the initial burden of identifying those portions of the record demonstrating a lack of a genuine factual dispute." *Barracuda, LLC v. GEICO Marine Ins. Co.*, 464 F. Supp. 3d 1264, 1266 (M.D. Fla. 2020) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). A factual dispute is "genuine" only if "a reasonable [fact finder] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"If the movant shows that there is no evidence to support the non-moving party's case, the burden then shifts to the non-moving party to demonstrate that there are, in fact, genuine factual disputes which preclude judgment as a matter of law." *Id.* (citing *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006)). At the summary judgment stage, trial court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249-50.

## III.   ARGUMENT

Plaintiff advances three arguments in its Motion. First, Plaintiff asserts that under New York law, breach of warranties in insurance policies vitiate coverage, *see* Doc. # 31-1 at 12; second, the hurricane plan at issue was a warranty that was breached, *see* Doc. # 32-1 at 18; and third, no claim for breach of contract or bad

faith exists.  *See* Doc. # 31-1 at 24.

It is clear that Prestige did not breach any warranty due to the inability of Captain Powers to haul Legal Limits out of the water (because the Pensacola Shipyard would not haul it out) or move it to another location due to the dangerous conditions from Hurricane Sally.  Defendant Prestige acted appropriately and reasonably in light of the circumstances.  Therefore, Prestige respectfully requests that this Court deny Plaintiff's Motion for Summary Judgment.

## A. Florida Law, as Opposed to New York Law, Should Supplement Maritime Law in This Case

It is undisputed that "marine insurance policies are governed by maritime law." *Barracuda, LLC*, 464 F. Supp. 3d at 1266; *see St. Paul Fire and Marine Ins. Co. v. Lago Canyon, Inc.*, 561 F.3d 1181, 1184 (11th Cir. 2009). However, where there is no federal maritime precedent governing a specific issue, courts will generally look to state law.  Here, the parties disagree as to whether Florida or New York law should supplement federal maritime law.

Plaintiff makes much of the fact that the policy includes a choice-of-law provision that calls upon New York state law to be applied where there is no federal maritime precedent.[35]  Citing *Great Lakes Reinsurance (UK) PLC v. Durham*

---

[35] *See* Doc. # 32-3 (Insurance Agreement between Prestige Worldwide Pensacola Charter LLC, Great Lakes Insurance, S.E., and non-party Concept Special Risks, Ltd.).

*Auctions, Inc.*,[36] a 2009 Fifth Circuit case, Plaintiff emphasizes that because it "maintains its trust accounts in New York, was approved as a surplus lines' insurer in the State of New York, and has its agent for service of process in New York," *see* Doc. # 31-1 at 12, ⁋ 26, New York law should apply without question.  However, under the facts of this case, this argument is flawed.

Without guidance from the Eleventh Circuit on its treatment of choice-of-law provisions in marine insurance contracts, the "general rule in the federal courts is that [a choice-of-law] provision will be applied unless the state in question 'has no substantial relationship to the parties or the transaction or the state's law conflicts with the fundamental purpose of maritime law.'"  *Great Lakes Reinsurance (UK), PLC v. Rosin*, 757 F. Supp. 2d 1244, 1251 (S.D. Fla. 2010) (quoting *Stoot v. Fluor Drilling Services, Inc.*, 851 F.2d 1514, 1517 (5th Cir. 1988)); *see Durham Auctions, Inc.*, 585 F.3d at 242 (holding that a "choice of law provision in a maritime insurance contract will be upheld in the absence of evidence that its enforcement would be unreasonable or unjust.").

Here, it is clear that New York has no substantial relationship to the parties or the transaction.  Not only was the subject insurance contract negotiated and entered into in Florida, but Legal Limits was purchased in Florida, its home port is in Florida, and the damage occurred in Florida—from a hurricane that hit the State of Florida.

---

[36] 585 F.3d 236 (5th Cir. 2009).

*See F.W.F., Inc. v. Detroit Diesel Corp.*, 494 F. Supp. 2d 1342, 1355 (S.D. Fla. 2007), *aff'd*, 308 F. App'x 389 (11th Cir. 2009) (quotation omitted) ("A maritime contracts interpretation may so implicate local interests as to beckon interpretation by state law."); *see also Irwin v. Eagle Star Ins. Co.*, 455 F.2d 827, 830 (5th Cir. 1972) (holding that Florida law, as opposed to maritime law, applied to the interpretation of a marine insurance contract because "Florida ha[d] [a] substantial and legitimate interest[:] The plaintiff [was] a Florida resident[,] and the yacht "Jomie" was anchored in Florida waters when she sank[;] [t]he . . . contract was brokered in Florida and the … insurance company is authorized to do business in that state . . . ."); *RMI Holdings v. Aspen Am. Ins. Co.*, 2020 WL 6749042, at *3 (N.D. Fla. July 15, 2020) (applying the "most significant relationship" test to determine which state's law, Florida or Georgia, would apply to a marine insurance contract).

Moreover, application of New York law would be unreasonable, as it may inhibit the forum state's (*i.e.*, Florida's) ability to effectively govern admiralty issues arising from inherently local events.  Florida has even enacted legislation explicitly stating that "protecting the lives and safety of vessel owners is placed before interests of protecting property."  *See* Fla. Stat. § 327.59(1) (marina evacuations in light of a hurricane watch or warning).  *See Burklow & Assoc., Inc. v. Belcher*, 719 So. 2d 31, 36 (Fla. 1st DCA 1998) (noting that protecting lives and safety of persons during a

hurricane, pursuant to Fla. Stat. § 327.59(1), "is a matter of paramount local concern to the citizens of Florida").

In sum, nothing about this lawsuit or the underlying transaction relates to New York. In light of the inherently local nature of the facts of this case, as stated above, it would be unreasonable to apply New York law. Consequently, Prestige respectfully requests that this Court apply Florida law where necessary.

**B. Under Florida Law, Prestige did Not Breach the HQP**

Plaintiff argues that Prestige is not entitled to coverage under the policy because it breached the HQP—a "warranty." This argument is without merit.

Plaintiff seems to conflate Florida law with both maritime law and New York law and spends a considerable amount of time focusing on cases in the Eleventh Circuit that apply maritime law when deciding whether an alleged breach of warranty voids coverage. *See Hilton Oil Transport v. Jonas*, 75 F.3d 627, 630 (11th Cir. 1996); *Lexington Ins. Co. v. Cooke's Seafood*, 835 F.2d 1364, 1366-67 (11th Cir. 1988); *Aguirre v. Citizens Casualty Company of New York*, 441 F.2d 141, 143 (5th Cir. 1971), *cert. denied*, 404 U.S. 829 (1971). However, reliance on these cases is misplaced, as Prestige has been unable to find any case stating that there is an entrenched federal maritime precedent governing hurricane plans in marine insurance contracts. To be sure, in *Travelers Prop. Cas. Co. of Am. v. Ocean Reef*

18

*Charters LLC*,[37] the Eleventh Circuit reaffirmed the Supreme Court's holding in *Wilburn Boat Co. v. Fireman's Fund Ins. Co.*,[38] that, notwithstanding these cases, there is no federal maritime rule "requiring strict fulfillment of marine insurance warranties," and that each specific warranty at issue must be analyzed on its own to determine whether a uniform rule is necessary. *Wilburn Boat Co.*, 348 U.S. at 314; *Ocean Reef Charters LLC*, 996 F.3d at 1168. Under these circumstances—because of the inherent volatile nature of hurricane—no uniform rule is necessary. Therefore, state law is applicable, and Florida law differs materially from New York law.

Under Florida law, "[a] breach . . . of any warranty . . . or provision of a wet marine . . . insurance policy . . . does not void the policy . . . or constitute a defense to a loss thereon, *unless such breach . . . increased the hazard by any means within the control of the insured*." Section 627.409(2), Fla. Stat. (emphasis added). "A 'hazard' under § 627.409(2) concerns 'danger to the insured vessel itself.'" S*erendipity at Sea, LLC v. Underwriters at Lloyd's of London Subscribing to Policy Number 187581*, 2021 WL 1348435, at *6 (S.D. Fla. Feb. 5, 2021) (quotation omitted). "The purpose of this statute is to 'prevent the insurer from avoiding coverage on a technical omission playing no part in the loss,' and to ensure that the

---

[37] 996 F.3d 1161 (11th Cir. 2021).
[38] 348 U.S. 310, 313 (1955).

breach 'significantly alters the risk of loss [the insurer] would be called on to bear.'"
*Rosin*, 757 F. Supp. 2d at 1258 (quoting *Pickett v. Woods*, 404 So. 2d 1152, 1153
(Fla. 5th DCA 1981) and *Fireman's Fund Ins. Co. v. Cox*, 742 F. Supp. 609, 611
(M.D. Fla.), *aff'd*, 892 F.2d 87 (11th Cir. 1989)).

In no persuasive manner can it be argued that Hurricane Sally's strength, slow
speed, and its ultimate trajectory/path was in the control of Prestige. *See Holdings
v. Aspen Am. Ins. Co.*, 2020 WL 7237259, at *1 (N.D. Fla. Sept. 1, 2020) (holding
that, under Section 627.409(2), any failure to update the Hurricane Protection Plan
or "double the line on the boat in accordance with the updated HPP" "did not relieve
[the insurer] of its coverage obligation because neither failure increased the hazard
of windstorm damage to the boat under the circumstances"). Indeed, the incredible
impact of Hurricane Sally on, and the extent of damage it caused to, *Pensacola,
Florida*, was fortuitous and unforeseeable,[39] and such situation excuses
noncompliance with the HQP. And, as stated above, Florida has specifically enacted
legislation regarding hurricanes and risk of bodily injury, and it is clear that personal
safety is of utmost concern. *See* Fla. Stat. § 327.59(1).

Furthermore, Captain Powers' decision to leave Legal Limits in its home port

---

[39] Additionally, "hurricanes . . . are considered in law to be an 'Act of God.' Even though storms
that are usual for waters and the time of year are not 'Acts of God,' a hurricane that causes
unexpected and unforeseeable devastation with unprecedented wind velocity, tidal rise, and
upriver tidal surge, is a classic case of an 'Act of God.'" *Skandia Ins. Co. v. Star Shipping AS*, 173
F. Supp. 2d 1228, 1239-40 (S.D. Ala. 2001) (footnotes omitted).

at Palafox Marina did not increase the hazard posed by Hurricane Sally.  Hurricane

Sally made landfall in Gulf Shores, Alabama, causing destruction to nearby cities—

including Pensacola.  Thus, even if Captain Powers was able to *safely* move Legal

Limits to the Pensacola Shipyard or BahiaMar Marina (which, he testified, he did

not believe was possible), there is no guarantee that it would not have also suffered

damage while there.[40]  It is wholly speculative to assert that, had Legal Limits been

moved anywhere that was not Palafox Marina (which Great Lakes does), it would

not have suffered damage.  It was simply impossible for Captain Powers to

implement the HQP in light of Hurricane Sally's swift change in direction so close

to when it would make landfall.  To be sure, less than 48 hours before it made

landfall, Hurricane Sally (then-Tropical Storm Sally) was projected to hit Louisiana.

Moreover, Plaintiff fails to acknowledge the inherent ambiguity within the

language of the HQP.  Under Florida law, courts must first "look to the text of

the policy and construe the policy 'in accordance with [its]

plain language.'"  *GEICO Marine Ins. Co. v. Shackleford*, 945 F.3d 1135, 1140

(11th Cir. 1990) (quoting *Swire Pac. Holdings, Inc. v. Zurich Ins. Co.*, 845 So. 2d

---

[40] Prestige notes that although Ms. Blackwell testified that, based on her recollection, none of the seven boats that were hauled out specifically for Hurricane Sally were damaged during the storm, Doc. # 32-6 at 27:13-25, 28:1-7, this does not translate to "no vessels were damaged during Hurricane Sally."  To be sure, Ms. Blackwell testified that some vessels that were ashore at Pensacola Shipyard during Hurricane Sally suffered damage.  *Id.* at 31:25, 32:1-4. Seeing as though Pensacola Shipyard is an outdoor storing facility—that is, there is no indoor or covered area, *see id.* at 29:5-11, it would be inappropriate to speculate that, had Legal Limits been hauled out by Pensacola Shipyard, it would not have suffered damage.

161, 165 (Fla. 2003)).  However, "'if the relevant policy language is susceptible to more than one reasonable interpretation, one providing coverage and the other limiting coverage,' the policy is ambiguous and [courts] must construe it in favor of coverage."  *Id.* (quoting *Swire Pac. Holdings, Inc.*, 845 So. 2d at 165).  Here, the ambiguity lies within the vague nature of *when* Prestige's duty to secure Legal Limits under the policy was triggered.  *See Taurus Holdings, Inc. v. U.S. Fid. & Guar. Co.*, 913 So. 2d 528, 532 (Fla. 2005) ("[I]nsurance contracts are interpreted according to the plain language of the policy except when a genuine inconsistency, uncertainty, or ambiguity in meaning remains after resort to the ordinary rules of construction.") (citation and internal quotation marks omitted).

As stated above, under Plan A of the HQP, Prestige was to take action to secure Legal Limits when authorities projected that a storm was going to approach "land."  A reasonable interpretation of the word "land" here refers to Pensacola, Florida—where Legal Limits is located.  But, the HQP also contained stock language that states, "[i]t is hereby warranted that in the event of a named or numbered storm warning or advisory issued by any competent local authority, we will secure the above vessel and/or its equipment in accordance with the representations stated above . . . ."[41]  This language, though, does not contain any reference to *where* a storm is projected to impact before taking action.  A strict interpretation of this

---

[41] Doc. # 32-4 (Hurricane Questionnaire/plan).

language would require Prestige to haul Legal Limits out of the water as soon as any tropical storm or hurricane was discovered—no matter where it was projected to hit, whether it be Miami, Florida, Galveston, Texas, or even Honolulu, Hawaii.  Such an interpretation is unreasonable and would be incredibly burdensome.  *See Aetna Ins. Co. v. Houston Oil & Transport Co.*, 49 F.2d 121, 123 (5th Cir. 1931) (citation omitted) ("[A] contract of marine insurance must  be  interpreted  in  the  light  of practical, sound common sense.").  Instead, this ambiguity should be construed in favor of Prestige.  *See Eagle Star Ins. Co. Limited of London, England v. Ross*, 247 So. 2d 514, (Fla. 3d DCA 1971) ("We find the policy to be ambiguous and apply the well-settled rule that where a warranty in a marine hull insurance policy would work a great hardship, policy language will be construed quite strictly in the assured's favor.").

Captain Powers made all reasonable efforts to try to comply with the HQP in light of the increasingly-intensifying nature of Hurricane Sally and the dangers that accompanied it as it moved closer to shore.  It was simply too dangerous to move the Vessel out of Palafox Marina to drive it anywhere, and any attempt to do so would have subjected Captain Powers to significant risk of bodily injury—a risk that Florida has explicitly stated is not worth taking.  *See* Fla. Stat. § 327.59(1).

Consequently, it is clear that Prestige did not breach any warranty.  Rather, Plaintiff breached the policy when it refused to pay out Prestige's valid claim.  As

such, Prestige respectfully requests that this Court deny Plaintiff's motion for summary judgment.

### C. Even if New York Law Applies, Great Lakes is Not Entitled to Summary Judgment

Should this Court find the choice-of-law provision valid and apply New York law, Great Lakes is still not entitled to summary judgment.

New York law provides that "an express warranty in a marine insurance policy 'must be literally complied with, and that noncompliance forbids recovery, regardless of whether the omission had a causal relation to the loss.'" *Rosin*, 757 F. Supp. 2d at 1257 (quoting *Jarvis Towing & Transp. Corp. v. Aetna Ins. Co.*, 298 N.Y. 280, 82 N.E.2d 577, 577 (1948)). But, "New York law governing 'the interpretation of exclusionary clauses in insurance policies is highly favorable to insureds.'" *Kephart v. Certain Underwriters at Lloyd's of London*, 427 F. Supp. 3d 508, 515 (S.D.N.Y. 2019) (quoting *Beazley Ins. Co., Inc. v. ACE Am. Ins. Co.*, 880 F.3d 64, 68 (2d Cir. 2018)). Under the facts and circumstances of this case, literal compliance was not feasible.

Plaintiff relies on *Kephart* for the proposition that the HQP is a warranty, and that a breach of the HQP voids coverage. However, the facts underlying *Kephart* distinguish it from the instant case.

In *Kephart*, a vessel was damaged during Hurricane Irma while stored ashore at a marina in Key West, Florida. 427 F. Supp. 3d at 514-15. Pursuant to the

24

insurance agreement, the plaintiff completed a hurricane preparedness plan, which

included the following language:

> If your vessel will be afloat between 1st of July and 1st of
> November please give full details of your plan for protecting the vessel
> in the event of any storm warning, including intended places of refuge,
> mooring and/or anchoring arrangements, size of line use, # of fenders,
> type of pilings and height and how the vessel will be secured ....

> Immediately go to a known hurricane hole -- if none close by
> then a river surrounded by mangroves -- double & triple lines using no
> less than 1" lines -- find a spot with less fetch -- so swells don't break
> you loose. Double & triple ground gear – plan for extra; water, food &
> emergency generator -- secure all items from boat that might fly around
> -- pump out bilges and close all three hulls[;] secure all items inside
> boat that might come loose and injure someone. Flash lights and
> medical supplies should be on hand –

> 7. Please supply details of your backup plan (if you are prevented
> from implementing your initial plan)

> If enough time is available make arrangements for a haulout track
> storms carefully

> 8. If laid up ashore from 1st of July and 1st of November will
> your vessel be supported by props or jack stands chained &/or welded
> together professionally?

> Yes

> 9. List all other measures to be taken to protect your vessel in the
> event of a storm? (e.g. remove and stow loose gear, stow or lash dinghy
> down, remove and stow canvas and sails, multiple mooring lines,
> snubbers, etc.)

> (see six above).

*Id.* at 511-12. During Hurricane Irma, the vessel was knocked off its blocking and

damaged. *Id.* at 513. Kephart had failed to remove the bimini and the mast on the vessel. *Id.* at 516. The owner of the vessel, Kephart, was out of the state in New Jersey during Hurricane Irma, but he left the vessel at "Robbie's Marina" in Key West with the understanding that the vessel was "being 'taken care of by Robbie's.'" *Id.* at 513. The plaintiff's insurance company denied coverage, stating that the plaintiff failed to follow its hurricane plan, thus breaching the contract. *Id.*

The court held in favor of the insurance company, stating that the plaintiff breached the hurricane plan, thus voiding coverage:

> The terms of the HPP which apply to this incident are unambiguous. The plain language of the HPP required Kephart to secure all items in and on the Vessel. Just above the signature section, the HPP required Kephart to "make every effort to secure [the] vessel[ ] &/or its equipment" and to take "all reasonable precautions necessary to safeguard the vessel and/or its equipment and accoutrements including ... removing and stor[ing] Biminis ..., canvas items, loose upholstery, cushions, [and] roller-furled sails" in the event of impending Named Storm winds. Similarly, Section Nine, which incorporated Section Six, required Kephart to "secure all items from boat that might fly around" and "secure all items inside boat that might come loose" in the event of a storm. While the HPP set forth separate agreed-upon steps to be taken to secure the Vessel itself depending on whether it was "afloat" or "laid up on shore," the HPP required items on the Vessel to be secured in both scenarios.
>
> The uncontradicted evidence in this case demonstrates that Kephart failed to perform these obligations.

*Id.* at 516-17.

In the instant case, the facts are much different. Here, Hurricane Sally was an extremely volatile hurricane that was difficult to track. Captain Powers attempted

to implement the HQP once the storm turned towards Pensacola, Florida, but he was unable to fully implement the HQP because of the dangers posed by Hurricane Sally. Thus, Captain Powers decided, based on his professional judgment, to leave Legal Limits in its home port so as to not risk bodily injury in relocating it.   And, importantly, Legal Limits was in an enclosed marina behind a nine-foot seawall and numerous buildings that could serve as a barrier to the strong southeast winds. Captain Powers removed all loose items and tied down the vessel in a manner that he believed, in his professional opinion, could withstand tropical storm-force winds.[42]  The facts of this case are simply too distinguishable from *Kephart* for it to have any teeth to it.

Moreover, New York law, like Florida law, considers possible ambiguity when interpreting a contract.   Under New York law, "insurance policies are interpreted according to general rules of contract interpretation."  *Kephart*, 427 F. Supp. 3d at 515 (quoting *Olin Corp. v. OneBeacon Am. Ins. Co.*, 864 F.3d 130, 147 (2d Cir. 2017)).   "The initial inquiry is whether the contractual language, without reference to sources outside the text of the contract, is ambiguous."  *Id.* (quoting *In re MPM Silicones*, 874 F.3d 787, 795 (2d Cir. 2017)).

---

[42] Doc. # 32-7 (Deposition of Joseph Lance Powers, dated 5/24/2021, at 7:7-13).   And, as mentioned above, the defective seawall meant to protect Palafox Marina significantly contributed to the damage caused to the vessels at the marina and the marina itself.  *See* Jim Little, *$1 million fox: Design flaw in city seawall at Palafox Pier led to destruction in Sally*, PNJ (Aug. 18, 2021, 5:40 AM), https://www.pnj.com/story/news/local/pensacola/2021/08/18/pensacola-palafox-pier-seawall-design-flaw-exposed-hurricane-sally/5555483001/.

> [C]ontract terms are ambiguous if they are capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business. . . .
>
>          . . .
>
> When a provision in an insurance contract is ambiguous, a court may consider extrinsic evidence to ascertain the parties' intent at the formation of the contract. If the extrinsic evidence fails to establish the parties' intent, courts may apply other rules of contract interpretation, including New York's insurance-specific version of the rule of <u>contra proferentem</u>, according to which ambiguity should be resolved in favor of the insured.

*Id.* (quotation omitted).

Here, as discussed at length above, the ambiguity lies within the vague nature of when Prestige's duty to secure Legal Limits under the HQP was triggered. Because of this, any doubt or question should be resolved in favor of Prestige—the insured.

Consequently, even if the Court were to apply New York law to the facts of this case, it would not change the outcome—Hurricane Sally's volatile nature (*i.e.*, its delayed change in direction and strength) made it impossible for Captain Powers to fully implement the HQP, and in light of this, Captain Powers made all reasonable efforts to secure Legal Limits.

## D. Prestige's Claims for Breach of Contract and Breach of the Implied Covenant of Good Faith and Fair Dealing Are Valid

28

Great Lakes contends that Prestige's claims for breach of contract and breach of the implied covenant of good faith and fair dealing should be dismissed because New York law applies.  Prestige maintains that application of New York law to this case would be unreasonable, as New York has no relationship whatsoever to the facts and circumstances underlying this case.

Great Lakes also insists that because there is no coverage (which Prestige disputes), there can be no claims for breach of contract and breach of the implied covenant of good faith and fair dealing.  This argument is premature and assumes an outcome not ruled upon by this Court.

Finally, Great Lakes asserts that there can be no claim for bad faith because the issue of coverage is subject to serious debate.  This is incorrect.  Great Lakes cites *Pozzi Window Co. v. Auto–Owners Insurance Inc.*, 446 F.3d 1178 (11th Cir. 2006) for the proposition that an insurer cannot commit bad faith as a matter of law when there is serious debate over coverage.  But, the decision in *Pozzi* came after a trial and after a jury verdict was rendered—not at the summary judgment stage.  At the very least, this issue should be reserved for trial—should Prestige's Motion for Summary Judgment be denied—as there are questions surrounding Great Lakes' good faith attempt(s) to settle claims when it could have and should have done so. *See Jimenez v. Gov't Empls. Ins. Co.*, 2014 WL 5810466, at *4 (M.D. Fla. Nov. 7, 2014) (quoting Fla. Stat. § 624.155(1)(b)(1)) ("An insurer acts in bad faith and is

thus subject to liability when it fails to 'attempt[ ] in good faith to settle claims when, under all the circumstances, it could and should have done so, had it acted fairly and honestly towards its insured.'"); *see id.* at \*5 ("The reasonableness of [an insurer's] contention and the refusal to settle in reliance on it is a question of fact.").

Consequently, Plaintiff's contentions here are all premature and should be denied.

## IV.   CONCLUSION

Considering all the facts presented above, Prestige has established that it did not breach any warranty, and that Plaintiff Great Lakes Insurance, S.E. breached the parties' contract by refusing to pay out Prestige's valid insurance claim on Legal Limits.  Consequently, Prestige respectfully requests the Court deny Great Lakes' Motion for Summary Judgment and enter judgment in favor of Prestige.

Dated: August 30, 2021

_____/s/ Bryan F. Aylstock_____
Bryan F. Aylstock, FL Bar No. 78263
Aylstock, Witkin, Kreis & Overholtz, PLLC
17 E. Main Street, Suite 200
Pensacola, FL 32502
Phone: 850-202-1010
Fax: 850-916-7449
Email: baylstock@awkolaw.com

*Counsel for Defendant, Prestige Worldwide Pensacola Charter, LLC d/b/a Legal Limits Outdoors*

## LOCAL RULE 7.1(F) CERTIFICATTION

Pursuant to Local Rule 7.1(F), the word count in this Memorandum of Law is
6463.

## CERTIFICATE OF SERVICE

Defendant, by and through its counsel, hereby certifies that on August 30, 2021, it served the following:

1. Defendant Prestige Worldwide Pensacola Charters, LLC's Response to Great Lakes Insurance Co.'s Motion for Summary Judgment and Memorandum of Law in Support.

via electronic mail upon:

LUGENBUHL, WHEATON, PECK, RANKIN &
HUBBARD, A LAW CORPORATION
Todd G. Crawford
MS State Bar No. 102620
tcrawford@lawla.com
2501 14th Street, Suite 202
Gulfport, Mississippi 39501
PH:    (228) 206-0033
FAX: (504) 310-9195

*Attorney for Great Lakes Insurance*